IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JEFFREY MENDICINO, et al.      :         CIVIL ACTION
                               :
          v.                   :
                               :
LOTUS ORIENT CORP., et al.     :         NO. 10-1867

MEMORANDUM

Dalzell, J.                                October 19, 2010

          Plaintiffs Jeffrey Mendicino and his company, Jeffrey

Mendicino, Inc. ("JM Inc."), formerly an independent contractor

sales representative for defendant Lotus Orient Corp. ("Lotus"),

have filed this breach of oral contract action against Lotus, its

President, Jing Wu, and its Vice-President, Linda Hillario, for

failing to pay them at least $100,000 in commissions.  Plaintiffs

sue Lotus for (1) breach of contract (Count I), (2) a violation

of Pennsylvania's Commissioned Sales Representative Act (Count

II), (3) unjust enrichment (Count III), and (4) an accounting

(Count VI).  Plaintiffs sue defendant Hillario for intentional

interference with contractual relations (Count IV), and defendant

Wu for detrimental reliance (Count V).

          Defendants move (1) to dismiss defendants Hillario and

Wu from this action pursuant to Fed. R. Civ. P. 12(b)(2), (2) for

a more definite statement with regard to the jurisdictional

minimum pursuant to Rule 12(e), and (3) for a more definite

statement regarding the existence of a contract between plaintiffs and defendant Lotus. In the alternative, defendants move to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), move under Rule 12(b)(1) to dismiss either Jeffrey Mendicino or JM Inc. from this action, and move under Rule 12(b)(6) to dismiss Count VI. For the reasons set forth below, we will grant defendants' motion in part and deny it in part.

## I. __Factual Background__

Defendant Lotus is a manufacturer, importer and wholesaler of bridal gowns and formal wear which it sells to retailers (the "Lotus Gown Lines"). Compl. at ¶ 8. Plaintiff Mendicino, through his company, JM Inc., has been an independent contractor sales representative for Lotus, selling the Lotus Gown Lines to retailers "on and off" since 1992. Id. at ¶¶ 8-10.

In 1997, Lotus terminated Hillario. Id. at ¶ 15. Six months after Lotus dismissed her, Lotus hired a new Sales Manager, Shawn Chen. Id. at ¶ 18. One year after Chen began working for Lotus, Mendicino began representing a couture wedding gown product line, Eve of Milady, which plaintiffs contend did not compete with Lotus. Id. at ¶ 19. According to plaintiffs,

it is common for independent contractor sales representatives to represent more than one line at a time.  Id. at ¶ 14.  In January of 2001, Chen terminated JM Inc.'s contract with Lotus.  Id. at ¶ 20.

Three months later, Lotus terminated Chen's employment and offered Mendicino his sales representative position back.  Id. at ¶ 21.  Mendicino declined, but in December of 2003, Lotus reached out to him again, offering him his territory back.  Id. at ¶¶ 22-23.  Mendicino agreed to return on the condition that he could continue to represent other non-competing product lines.  Id. at ¶ 24.  Lotus agreed and sent Mendicino a Sales Representative Agreement, which Mendicino marked up but never signed.  Id. at ¶¶ 25-28.

In February of 2004, Mendicino began working for Lotus again -- allegedly pursuant to an oral contract -- never having executed any written contract.  Id. at ¶ 29.  Mendicino avers that he and Lotus agreed "as outlined in the Proposed, but unexecuted, Sales Representative Agreement" (that is, orally) that Mendicino would have the exclusive right to sell the Lotus Gown Lines in Pennsylvania, Maryland, Delaware, New Jersey, New York, and Washington D.C., and that Lotus would pay Mendicino eight percent of the net sales amount for all gowns sold and then

shipped to that territory. Id. at ¶ 30. Lotus agreed to pay
Mendicino by the fifteenth of the second month following
shipment. Id. Mendicino also avers that he, Lotus, and Lotus
President Wu "further agreed, as stated in the unexecuted
Proposed Sales Representative Agreement, and per Defendant Lotus
Orient's general corporate policy, that either party could
terminate the agreement by giving the other sixty (60) days
written notice, and that, in the event of termination, Plaintiffs
would be paid on all orders made prior thereto, even if shipment
was made thereafter." Id. at ¶ 31.

After Lotus terminated Hillario in 1997, Hillario went
to work for Victoria Bridal, a competitor of Lotus. Id. at ¶ 34.
While Hillario was working for Victoria Bridal, Hillario
approached Mendicino and asked him to leave Lotus and work
exclusively for Victoria Bridal. Id. at ¶ 35. Mendicino
declined Hillario's offer, which, Mendicino now contends, caused
bad blood between them. Id. at ¶ 36.

Between 2004 and 2008, Mendicino's sales for Lotus
increased and his territory expanded. Id. at ¶¶ 37-39. In
January of 2007, Lotus began paying JM Inc. an additional $700
per month beyond the amount of Mendicino's commissions, as a
consulting fee. Id. at ¶ 40.

In December of 2007, Lotus rehired Hillario as a Vice-President. Id. at ¶ 42. Within the first week of her rehire, Hillario contacted all of Lotus's sales representatives except Mendicino. Id. at ¶ 44. After waiting a week, Mendicino contacted Hillario "to welcome her back" at which time Hillario was "extremely cold and abrupt." Id. at ¶ 45. Mendicino avers that a number of current and former employees of Lotus told him that Hillario was "making it clear to everyone that she was trying to get Plaintiff's sales representative arrangement with Defendant Lotus Orient terminated." Id. at ¶ 47.

In February of 2009, plaintiffs contend that Hillario stopped paying JM Inc. the $700 monthly consulting fee. Id. at ¶ 58. Mendicino, nervous that his job was in jeopardy, asked Wu whether Lotus intended to terminate him. Id. at ¶ 61. In June of 2009, Wu allegedly reassured Mendicino that Lotus did not intend to terminate its agreement with JM Inc. Id. But on June 16, 2009, Mendicino received a letter from Hillario "releasing" him "from Defendant Lotus" because "sales had fallen far below expectations." Id. at ¶ 62. Hillario also informed Mendicino that he would be paid commissions only for those products shipped through August 31, 2009 on orders received by June 30, 2009. Id.

On June 21, 2009, Mendicino sent Wu and Hillario an

email asking that Lotus abide by the terms to which Mendicino and Wu had (allegedly) orally agreed, including that he be (1) given sixty days' notice of termination, per the company policy, (2) paid commissions on all orders received as of August 31, 2009, (3) compensated for the orders received from a show in July of 2009 for customers within his territory, (4) given an order report that would allow him to confirm what commissions were still due and owing, and (5) paid back for all accounts that had paid beyond 180 days from the date due. He also sought payment for past owed commissions of $15,000 still due him for adjustments made to sales between 2004 and 2007. Id. at ¶ 63. Lotus, Wu, and Hillario did not respond to Mendicino's email. Id. at ¶ 64.

On July 2, 2009, Lotus replaced Mendicino with a new sales representative (who happened to be Mendicino's estranged brother), and gave him Mendicino's accounts. Id. at ¶ 65. On December 15, 2009, Mendicino received a check from Lotus in the amount of $3,109.08 for "08/2009 final commissions [sic]." Id. at ¶ 66. Mendicino avers that he did not cash the check because it fell far short of the more than $100,000 he believes he is owed. Id. at ¶¶ 67-68.

## II.    **Analysis**

Defendants present a series of challenges to our jurisdiction over certain parties in this action.  Lotus challenges JM Inc.'s standing under Fed. R. Civ. P. 12(b)(1), and challenges our in personam jurisdiction over individual defendants Wu and Hillario, pursuant to Fed. R. Civ. P. 12(b)(2).  Defendants also seek a more definite statement regarding the jurisdictional minimum for a diversity case pursuant to Fed. R. Civ. P. 12(e), and a more definite statement with regard to whether a contract exists between plaintiffs and defendant Lotus.  In the alternative, defendants under Rule 12(b)(6) move to dismiss the complaint on the basis of a valid arbitration provision and a valid forum selection clause.  Finally, defendants move under Rule 12(b)(6) to dismiss Count VI (accounting).

We begin by addressing defendants' motion to dismiss plaintiff JM Inc. pursuant to Fed. R. Civ. P. 12(b)(1).

### A.    **Plaintiffs' Standing**

While defendants argue in their motion to dismiss that JM Inc. does not have standing in this case, in their memorandum of law in support of their motion to dismiss they specify that it

is Jeffrey Mendicino, the <u>individual</u>, who does not have standing in this case. Because defendants cite legal authorities in both the motion itself and the memorandum of law in support of it, we will interpret this as an attempt to argue that either JM Inc. <u>or</u> Jeffrey Mendicino does not have standing, but not both.

A party asserting that a Court has jurisdiction always bears the burden of showing that the case is properly before that court. <u>Packard v. Provident Nat'l Bank</u>, 994 F.2d 1039, 1045 (3d Cir. 1993) (citing <u>McNutt v. General Motors Acceptance Corp.</u>, 298 U.S. 178, 189 (1936)). Where subject matter jurisdiction "in fact" is challenged -- as it is here -- the trial court's power to hear the case is at issue, and the court is therefore "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." <u>Mortensen v. First Federal Savings and Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977). In such a Rule 12(b)(1) attack, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." <u>Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.</u>, 227 F.3d 62, 69 (3d Cir. 2000) (internal quotation marks omitted). Where a defendant attacks a court's factual basis for exercising subject matter

jurisdiction, the plaintiff must meet the burden of proving that

jurisdiction indeed lies. Id.

The constitutional minimum of standing has three

elements:

> First, the plaintiff must have suffered an
> 'injury in fact'-an invasion of a legally
> protected interest which is (a) concrete and
> particularized, and (b) actual or imminent,
> not conjectural or hypothetical. Second,
> there must be a causal connection between the
> injury and the conduct complained of. . . .
> Third, it must be likely, as opposed to
> merely speculative, that the injury will be
> redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)

(internal citations and quotation marks omitted). The party who

seeks the exercise of federal jurisdiction bears the burden of

alleging facts that "he is a proper party to invoke judicial

resolution of the dispute." Warth v. Seldin, 422 U.S. 490, 518

(1975). To establish an actionable injury, "the plaintiff must

show he [or she] personally has suffered some actual or

threatened injury as a result of the putatively illegal conduct

of the defendant [and][t]he injury must be concrete and capable

of being redressed by the court should the plaintiff prevail on

the merits." Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181,

188-89 (3d Cir. 2006) (internal quotation marks omitted).

It does not aid our analysis that throughout the complaint plaintiffs refer to "Plaintiff" and "Plaintiffs" interchangeably. At times, plaintiffs refer to "Plaintiff's brother" -- who we will assume is a real person and not a fellow subsidiary with the same corporate parent as JM Inc. But plaintiffs also refer to Lotus beginning to pay "Plaintiff" an additional $700 which we learn (in Jeffrey Mendicino's affidavit) was paid to JM Inc. Pl. Resp., Affidavit of Jeffrey Mendicino at ¶ 21. Plaintiffs also aver that "Plaintiff Mendicino was paid by Defendant Lotus Corporation for his sales efforts <u>through Plaintiff Jeffrey Mendicino Inc.</u>" Compl. at ¶ 2, ¶ 33 (emphasis added).

With regard to the evidence submitted, plaintiffs include with their complaint a copy of the check that was made out to "Jeffrey Mendicino, Inc.," on December 15, 2009, for "08/2009 FINAL COMMISSION" in the amount of $3,109.08. Compl., Ex. E. This suggests that Lotus paid the company, JM Inc., and the company in turn paid the man, Jeffrey Mendicino. In the affidavit of Jeffrey Mendicino, he avers that he, Lotus and defendant Wu agreed that "Jeffrey Mendicino, Inc.[,] would be paid commissions on shipment. . . ." Pl. Resp., Affidavit of Jeffrey Mendicino at ¶ 17. According to this affidavit, all

10

payments were made to JM Inc. and none was made to Jeffrey

Mendicino himself.  Id. at ¶¶ 17-19, 21-22, 24.  Plaintiffs also

included two copies of the unsigned Representative Sales

Agreement with the complaint, which, had they been signed, would

have created a binding contract between Lotus and Jeffrey

Mendicino, Inc.[1]  Although plaintiffs claim that defendants owe

both Jeffrey Mendicino and JM Inc., $100,000 in commissions,

there is no indication that Lotus owes Jeffrey Mendicino

anything.  If Lotus owes any alleged shortfall in payment, it is

to JM Inc. alone.

Thus, with regard to JM Inc.'s standing, the complaint

and the evidence submitted provide sufficient facts to show that

(1) an alleged injury occurred that is (2) causally connected to

the alleged oral contract which (3) could be addressed by a

favorable ruling.  With regard to Jeffrey Mendicino as an

individual, plaintiffs have not alleged any facts to show that he

was injured at all.  Thus, we conclude that plaintiffs have not

alleged anything upon which we could reasonably conclude that

Jeffrey Mendicino himself has standing to assert any claims in

---

[1]The signature page has a line for "Jeffrey Mendicino
COMPANY." Of course, plaintiffs are emphatic in their pleading
that this agreement is not a valid contract because it was never
executed.  Compl., Ex. A at 6.

this matter, and he will be dismissed as a plaintiff here.

Henceforth, the only plaintiff in this action will be JM Inc.

### B.  **Personal Jurisdiction**

Defendants argue that we do not have personal
jurisdiction over defendants Hillario and Wu because
"[p]laintiffs have failed to plead any facts which suggest that
the Commonwealth of Pennsylvania has personal jurisdiction over
either Jing Wu or Linda Hillaro [<u>sic</u>]."  Mem. of Law in Sup. Of
Defs' Mot. to Dismiss ("MTD") at seventh unnumbered page.

Pursuant to Rule 12(b)(2), once a defendant has raised
a jurisdictional defense the plaintiff bears the burden of
demonstrating a <u>prima</u> <u>facie</u> case that defendant has sufficient
contacts with the forum state to establish personal jurisdiction.
<u>North Penn Gas v. Corning Natural Gas Corp.</u>, 897 F.2d 687, 689
(3d Cir. 1990).  "The plaintiff must sustain its burden of proof
through sworn affidavits or other competent evidence."  <u>Id.</u>
(internal quotation marks omitted).  A court "reviewing a motion
to dismiss a case for lack of in personam jurisdiction must
accept all of the plaintiff's allegations as true and construe
disputed facts in favor of the plaintiff."  <u>Carteret Sav. Bank,</u>
<u>FA v. Shushan</u>, 954 F.2d 141, 142 n.1 (3d Cir. 1992), <u>see also</u>

<u>Pinker v. Roche Holdings Ltd.</u>, 292 F.3d 361, 368 (3d Cir. 2002).

A plaintiff may not rely on bare pleadings, however, but must

respond with actual proof once the motion is made. <u>Patterson v.

Fed. Bureau of Investigation</u>, 893 F.2d 595, 603-4 (3d Cir. 1990).

Rule 4(e) of the Federal Rules of Civil Procedure

authorizes a district court to exercise personal jurisdiction

over a non-resident defendant to the extent allowed by the long-

arm statute of the state in which the court sits. <u>Provident

Nat'l Bank v. Cal. Fed. Sav. and Loan Ass'n</u>, 819 F.2d 434, 436

(3d Cir. 1987). Pennsylvania's long-arm statute establishes

personal jurisdiction over a non-resident defendant to the

fullest extent the Due Process Clause of the Fourteenth Amendment

allows. <u>Remick v. Manfredy</u>, 238 F.3d 248, 255 (3d Cir. 2001).

Personal jurisdiction may exist under either general

jurisdiction or specific jurisdiction. General jurisdiction

exists where a defendant has had "continuous and systematic"

contacts with the forum state. <u>Helicopteros Nacionales de

Columbia, S.A. v. Hall</u>, 466 U.S. 408, 416 (1984). Specific

jurisdiction exists where the plaintiff's cause of action arises

out of the defendant's contact with the forum state such that the

defendant "should reasonably anticipate being haled into court"

in that forum. <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S.

13

286, 297 (1980).

The constitutionality test for specific jurisdiction has two parts. First, the defendant must have had constitutionally sufficient "minimum contacts" with the forum state. <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 474 (1985). Second, exercising jurisdiction must also comport with "traditional notions of fair play and substantial justice." <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)(internal quotation marks omitted). Satisfaction of the first prong depends on whether the defendant has "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." <u>Burger King</u>, 471 U.S. at 475 (quoting <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958)). "Due process does not require a defendant's physical presence in the forum before personal jurisdiction is exercised." <u>Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.</u>, 988 F.2d 476, 482 (3d Cir. 1993).

In determining whether a court in Pennsylvania has specific jurisdiction over a defendant for a breach of contract claim, a court must consider "the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual

14

course of dealing." <u>Remick</u>, 238 F.3d at 256. Our Court of Appeals has stated that it takes a "highly realistic" approach to analyzing minimum contacts, and that it looks to, "<u>inter alia</u>, prior negotiations and contemplated future consequences, along with the terms of the contract...." <u>Grand Entertainment Group, Ltd. v. Star Media Sales, Inc.</u>, 988 F.2d 476, 482 (3d Cir. 1993)(internal quotation marks omitted)(citing <u>Mellon Bank (East) PSFS, National Association v. Farino</u>, 960 F.2d 1217 (3d Cir. 1992)).

JM Inc. argues that we have both specific and general jurisdiction over Hillario and Wu. As proof that we have jurisdiction over them, it submits the Affidavit of Jeffrey Mendicino in which he swears that both Hillario and Wu "directed numerous telephone calls, letters, emails, faxes and commission payments to [its] Pennsylvania office." Pl. Resp., Affidavit of Jeffrey Mendicino at ¶¶ 30-31. JM Inc. also cites as evidence Exhibits C and E of the complaint -- which are the letter from Hillario on behalf of Lotus terminating Lotus's relationship with plaintiff, and the check for $3,109.08 made out to Jeffrey Mendicino, Inc., drawn from the account of Lotus Orient Corp. Collectively, JM Inc. contends that these contacts are sufficient for us to have general personal jurisdiction over Hillario and

15

Wu, as long as they are not protected by the corporate shield
doctrine.

Generally, however, "[i]ndividuals performing acts in a
state in their corporate capacity are not subject to personal
jurisdiction of the courts of that state for those acts." <u>Bowers
v. NETI Technologies, Inc.</u>, 690 F. Supp. 349, 357 (E.D. Pa.
1988). <u>See also</u> <u>TJS Brokerage & Company, Inc. v. Mahoney</u>, 940 F.
Supp. 784, 789 (E.D. Pa. 1996); <u>Maleski v. D.P. Realty Trust</u>, 653
A.2d 54, 63 (Pa. Cmwlth. Ct. 1994).

A recognized exception to this general rule is that a
"corporate agent may be held personally liable for torts
committed in the corporate capacity." <u>Nat'l Precast Crypt Co. v.
Dy-Core of Pennsylvania, Inc.</u>, 785 F. Supp. 1186, 1191 (W.D. Pa.
1992). Courts recognizing this exception allow personal
jurisdiction in such circumstances so the corporate defendant
will "not be able to use a corporate shield to protect himself
from suit in this forum." <u>Beistle Co. v. Party U.S.A., Inc.</u>, 914
F. Supp. 92, 96 (M.D. Pa. 1996). This District has invoked the
corporate shield doctrine to protect officers and directors from
being haled into court based solely upon their status within a
corporation. <u>See</u>, <u>e.g.</u>, <u>Simkins Corp. v. Gourmet Resources
Int'l</u>, 601 F. Supp. 1336, 1344 (E.D. Pa. 1985). But other courts

16

have balanced this concern with "the principle that, in Pennsylvania, corporate officers and directors are liable for the tortious acts the corporation commits under their direction or with their participation." Maleski, 653 A.2d at 63 (citing Al-Khazraji v. St. Francis College, 784 F.2d 505 (3d Cir.1986), aff'd 481 U.S. 604 (1987)). We balance these concerns by considering: (1) the officer's role in the corporate structure; (2) the quality of the officer's contacts; and (3) the extent and nature of the officer's participation in the alleged tortious conduct. Elbeco, Inc. v. Estrella de Plato, Corp., 989 F. Supp. 669, 676 (E.D. Pa. 1997) (citing Maleski, 653 A.2d at 63); Moran v. Metropolitan District Council of Philadelphia and Vicinity, 640 F. Supp. 430, 434 (E.D. Pa. 1986).

As President and Vice-President of Lotus -- which at times had JM Inc. as its sole sales representative in the Commonwealth -- defendants knew they were involved with a Pennsylvania corporation and that the consequences of their actions would have ramifications in Pennsylvania. See Strick Corp. v. A.J.F. Warehouse Distributors, Inc., 532 F. Supp. 951, 960 (E.D. Pa. 1982).

Plaintiff claims that it detrimentally relied on Wu's assurances that Lotus would not terminate its relationship with

JM Inc.  Wu is the President of Lotus as well as a Director and
the Chief Executive Officer of the corporation.  Pl. Resp.,
Affidavit of Jeffrey Mendicino at ¶ 28.  Mendicino swears that
"Wu actively oversaw the operations of Lotus Orient Corporation,
and negotiated, developed and maintained the contractual
relationship between myself, my closely held corporation, Jeffrey
Mendicino, Inc., and Lotus Orient Corporation," and that Wu
"directed numerous telephone calls, letters, emails, faxes and
payment of commissions to [his] Pennsylvania office."  Pl. Resp.,
Affidavit of Jeffrey Mendicino, ¶¶ 29-30.  In addition, plaintiff
avers in the complaint that Mendicino specifically asked Wu on at
least two occasions if Lotus was intending to terminate JM Inc.
Compl. at ¶ 61.  JM Inc. claims that it detrimentally relied on
these reassurances that Lotus would not terminate it, but avers
no facts to support a contention that Jeffrey Mendicino
contemplated leaving Lotus before he was terminated, but
nevertheless continued to provide services for Lotus based on
Wu's assurances.

       While it is possible that Lotus continued to receive a
benefit from JM Inc., this is not relevant to plaintiff's claim.
"The issue is detriment to the promisee, not benefit to the
promisor."  Pane v. RCA Corp., 868 F.2d 631, 638 (3d Cir. 1989).

Thus, we find that plaintiff has insufficiently pled any tortious behavior on the part of Wu, and we will dismiss Wu as a defendant from this action.

JM Inc. avers that defendant Hillario had similar contacts with it and had a similar position of power within Lotus as Wu, and that she intentionally interfered with plaintiff's contractual relations. In Pennsylvania, the elements of a cause of action for intentional interference with contractual relations, whether existing or prospective, are: (1) the existence of a contractual or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant specifically intended to harm the existing relation or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. Al Hamilton Contracting Co. v. Cowder, 644 A.2d 188, 191 (Pa. Super. Ct. 1994). JM Inc. alleges the existence of an oral contract, purposeful conduct on the part of Hillario intended to harm the relationship, the absence of justification on the part of Hillario in disrupting JM Inc's relationship with Lotus and actual damages. The motion to dismiss Hillario from this action

pursuant to Fed. R. Civ. P. 12(b)(2) will therefore be denied.

**C.    <u>Jurisdictional Minimum</u>**

Defendants move under Rule 12(e) for a more definite statement regarding the jurisdictional minimum, claiming that JM Inc. has failed to show that it has met the jurisdictional threshold of just over $75,000.

Federal courts have diversity jurisdiction where there is complete diversity among the parties and the amount in controversy meets the jurisdictional minimum. <u>See</u> 28 U.S.C. § 1332(a). The requisite minimum is $75,000.01.  As a general rule, that amount is determined from the good faith allegations appearing on the face of the complaint. <u>See</u> <u>St. Paul Mercury Indemnity Co. v. Red Cab Co.</u>, 303 U.S. 283, 288-89 (1938); <u>Angus v. Shiley Inc.</u>, 989 F.2d 142, 145 (3d Cir. 1993).  A complaint will be deemed to satisfy the jurisdictional amount in controversy unless the defendant can show "to a legal certainty" that the plaintiff cannot recover that amount. <u>Red Cab</u>, 303 U.S. at 289.  When the court can determine with "legal certainty" that the amount in controversy does not satisfy the jurisdictional minimum, dismissal is warranted.  <u>Christman v. Cigas Machine Shop, Inc.</u>, 293 F. Supp. 2d 538, 541-542 (E.D. Pa.2003). "The

test then is not what amount the plaintiff claims in the ad damnum clause of his complaint, but rather, whether it appears to a 'legal certainty' that he cannot recover an amount above the jurisdictional minimum." Nelson v. Keefer, 451 F.2d 289, 293 (3d Cir. 1971).

Defendants claim that plaintiff failed to attach any documentary evidence in support of its claim that it is owed at least $100,000 in commissions, and that this means that plaintiff has failed to meet its burden of establishing the jurisdictional amount in controversy. MTD at eighth unnumbered page. But the only burden that plaintiff has at this initial stage is to allege in good faith that the jurisdictional minimum has been met. Defendants have failed to show to a legal certainty -- and we cannot now determine -- that the amount in controversy has not been met. Thus, we will deny defendants' motion for a more definite statement with regard to the jurisdictional minimum.

### D.   **The Existence of a Valid Contract**

Defendants move for a more definite statement regarding the existence of a contract between JM Inc. and Lotus pursuant to Fed. R. Civ. P. 12(e), or, alternatively, move to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) on

the basis of a valid forum selection clause and/or an arbitration clause in the written contract.[2]

Plaintiff emphatically denies the existence of a valid written contract while simultaneously insisting that several of the terms in the written contract to which it is <u>not</u> a party are enforceable under the vague and highly favorable oral contract to which plaintiff claims it <u>is</u> a party. To state a claim for breach of contract, Pennsylvania law requires a plaintiff to

_____

[2]To survive a Rule 12(b)(6) motion, a party's factual allegations must raise a right to relief above the speculative level, and a complaint must allege facts suggestive of illegal conduct. <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 563 n.8 (2007); <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 232 (3d Cir. 2008) (citing <u>Twombly</u>). The Supreme Court recently clarified the <u>Twombly</u> standard in <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009), where it held that a complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." <u>Iqbal</u>, 129 S. Ct. at 1949 (internal quotation marks omitted). A claim has facial plausibility when the plaintiff pleads facts sufficient to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> The plausibility standard is not as demanding as a "probability requirement," but it does oblige a plaintiff to allege facts sufficient to show that there is more than the mere possibility that a defendant has acted unlawfully. <u>Id.</u> (internal quotation marks omitted).

In deciding a motion to dismiss, "courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. A document forms the basis of a claim if the document is 'integral to or explicitly relied upon in the complaint.'" <u>Lum v. Bank of America</u>, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (internal citations omitted).

establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Supper. Ct. 1999)) (internal quotation marks omitted).

The parties appear to agree that no valid written contract exists between them. Defendants have inexplicably declined to move to dismiss plaintiff's breach of contract claim based on the non-existence of an oral contract, and instead proceed with their Rule 12(b)(6) motion assuming arguendo that all of the terms of the unexecuted written contract bind the parties. Under this rationale, defendants argue that the breach of contract claim, the violation of the Pennsylvania Commissioned Sales Representative Act claim, the intentional interference with contractual relations claim, the detrimental reliance claim, and the accounting claim, must all be dismissed based on the forum selection clause and/or the arbitration clause of the unexecuted written agreement. Since neither party has asserted that the written agreement binds anyone, we will not enter the alternate universe in which this supposed contract might have been executed. We will therefore deny the motion to dismiss as it is

23

based upon a "contract" that never existed.

In the alternative, defendants move for a more definite statement regarding the existence of a contract between plaintiff and defendant Lotus. Rule 12(e) provides: "A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). Such motions, however, "are highly disfavored since the overall scheme of the federal rules calls for relatively skeletal pleadings and places the burden of unearthing factual details on the discovery process." Hughes v. Smith, No. 03-5035, 2005 WL 435226, at * 4 (E.D. Pa. Feb. 24, 2005) (internal citation and quotation marks omitted). "The basis for granting a 12(e) motion is unintelligibility, not lack of detail." Id. (internal quotation marks omitted). Plaintiff's complaint certainly lacks detail, but it is not unintelligible. We will therefore deny the motion for a more definite statement.

### E. Accounting

Finally, defendants move under Rule 12(b)(6) to dismiss plaintiff's sixth count, arguing that "accounting" is a remedy and not a cause of action. But accounting can be a cause of

action where a valid contract exists.  <u>Alpart v. General Land</u>

<u>Partners, Inc.</u>, 574 F. Supp. 2d 491, 508 (E.D. Pa. 2008); <u>Berger</u>

<u>& Montague, P.C. v. Scott & Scott, LLC</u>, 153 F. Supp. 2d 750, 754

(E.D. Pa. 2001).  As we have not yet decided whether a valid

contract exists, we will deny the motion to dismiss Count VI

without prejudice.

**V.    <u>Conclusion</u>**

We will grant defendants' motion to dismiss plaintiff

Jeffrey Mendicino from this action pursuant to Fed. R. Civ. P.

12(b)(1) and grant the motion to dismiss defendant Jing Wu from

this case pursuant to Fed. R. Civ. P. 12(b)(2).  In all other

respects, we will deny defendants' motion to dismiss.

BY THE COURT:

__\s\Stewart Dalzell